# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ERIN WILLIAMS,**

     **Plaintiff,**

    **v.**                                      **Case No. 20-CV-856-SCD**

**ANDREW M. SAUL,**
**Commissioner of Social Security,**

     **Defendant.**

---

## DECISION AND ORDER

---

Erin Williams first applied for Social Security benefits in 2013, alleging that she is disabled based on various mental impairments. Williams' application was denied at the state-agency level and three times by an administrative law judge. Following her most recent administrative hearing in March 2020, an ALJ denied benefits, finding that Williams remained capable of working notwithstanding her impairments. Williams now seeks judicial review of that decision, arguing that the ALJ erred in weighing the opinions of her treating providers, evaluating her alleged symptoms, and assessing her residual functional capacity. The Commissioner contends that the ALJ did not commit a reversible error of law in reaching his decision and that the decision is otherwise supported by substantial evidence.

I agree that the ALJ committed reversible error in weighing the opinions of Williams' mental health providers and evaluating Williams' allegations of disabling mental health symptoms. Because Williams' application has been pending for nearly eight years and been remanded twice already, rather than remand again for further proceedings, I will reverse and remand for an award of benefits.

## BACKGROUND

Williams was born on March 31, 1977, in Milwaukee, Wisconsin. R. 938, 2047.[1] She was raised by her mother and maternal grandmother but saw her father periodically. R. 2047. Despite having learning difficulties, Williams was not enrolled in special education classes. *Id.* She had some friends but was extremely shy and developed anxiety during middle school, with no specific trigger. R. 2046–47. Attendance issues prevented Williams from graduating high school, though she did later attain her GED. R. 2047. After high school, she had a few short-term jobs working in a factory, housekeeping, laundry, and mail sorting. *Id.* But the longest she lasted in a job was only three months, and she hasn't worked at all since 2001. *Id.* Williams began experiencing increased anxiety and depression after the birth of her daughter—the first of four—around 2007. R. 2046. Since then, she has been in and out of treatment and prescribed various medications; however, she has never been hospitalized for mental health issues. *Id.*

In May 2013, Williams applied for supplemental security income from the Social Security Administration (SSA), alleging that she became disabled on April 1, 2000, the day after she turned twenty-three years old. R. 16, 36, 171–77. Williams asserted that she was unable to work due to the following medical conditions: panic disorder, agoraphobia, mood disorder, depression, and anxiety. R. 220. After her application was denied at the state-agency level, R. 73–99, Williams requested an administrative hearing before an ALJ, R. 119–21. Williams, along with her attorney, appeared via video before ALJ Joel G. Fina on April 12, 2016. R. 34–77. At the hearing, Williams amended her alleged onset date of disability to May

---

[1] The transcript is filed on the docket at ECF No. 15-1 to ECF No. 15-6.

9, 2013, the date of her application. R. 38, 198. Williams testified that she was unable to work due to agoraphobia and low energy. R. 39.

Applying the standard five-step process, *see* 20 C.F.R. § 416.920(a)(4), on June 1, 2016, the ALJ issued a written decision concluding that Williams was not disabled. *See* R. 13–33. Williams requested review of the ALJ's decision by the SSA's Appeals Council. R. 169–70. On August 6, 2017, the Appeals Council denied Williams' request for review, R. 1–7, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). Thereafter, Williams sought judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). *See* R. 967–68.

While the 2013 claim was pending in federal court, Williams filed a new claim for SSI in October 2017, alleging disability as of October 25, 2017, due to the following medical conditions: agoraphobia, social anxiety disorder, depression, anxiety, panic disorder, multiple sclerosis, anemia, and leg weakness. *See* R. 1040, 1233, 1238. Williams began experiencing symptoms of MS in 2015 and was officially diagnosed the following year. R. 2046. Pursuant to a stipulation, the district court reversed the ALJ's decision and remanded the matter to the Commissioner for further proceedings. *See* R. 989–94.

On remand, the Appeals Council vacated the ALJ's decision, consolidated the 2013 claim and the 2017 claim, and sent the matter back to the ALJ for a new hearing. R. 998–1003. Williams (still represented by the same attorney) appeared in person before ALJ Brent Bedwell for another hearing on October 24, 2018. *See* R. 932–63. At the hearing, Williams testified that she was living in an apartment in Milwaukee with her two teenage daughters. R. 938–39. When asked why she believed she was disabled and unable to work, Williams responded, "Well for one I have agoraphobia, panic attacks, social anxiety disorder. I also

3

have MS and I suffer through weakness, exhaustion, numbness on my left side." R. 940–41. Williams stated that she had three or four panic attacks each week, which often were triggered by thoughts of leaving the house or having to go out in big crowds. R. 941–42. According to Williams, the left-sided numbness "comes and goes" where her legs go limp and she drops things. R. 944. Williams also reported having memory problems. R. 951–52.

At the time of the hearing, Williams was prescribed several medications for her mental health conditions and one for her MS. R. 942–44. She stated that the medications helped control her symptoms but also made her sleepy. R. 943, 945. Williams indicated that she took a two-hour nap two or three times a week. R. 953–54. Williams also was in counseling, but she didn't find it too helpful. R. 945–46. When asked about her prior issues with medication compliance, Williams blamed her agoraphobia and memory problems, stating, "Most likely it was hard for me to leave the house so I just probably forgot about it." R. 945.

As for her daily activities, Williams confirmed that after getting up in the morning, she would have coffee and get her children up and ready for school. R. 946. Then she would spend the day performing household chores like sweeping, cleaning dishes, and doing laundry and watching TV or going grocery shopping. R. 946–47. Williams indicated that she went shopping about once per month but that she always brought her mother or children with her whenever she went out and that she shopped late at night or early in the morning "[b]ecause there's less people." R. 947, 950–51. Williams also stated that she often has "bad days" where she doesn't get dressed, shower, or do much of anything other than lie in bed. R. 952–53. She estimated having bad days three or four times a week. R. 953.

On December 7, 2018, ALJ Bedwell issued another unfavorable decision. *See* R. 1041–69. After Williams filed written exceptions to the ALJ's December 2018 decision, R. 1159–

69, the Appeals Council assumed jurisdiction and remanded the matter again to the ALJ for another hearing, R. 1070–76. On March 19, 2020, Williams (and her attorney) appeared via teleconference before ALJ Bedwell for a third administrative hearing. *See* R. 910–30.

At the hearing, Williams testified that her conditions had worsened since the least hearing: "Well I'm having more panic attacks and just going through depression, also no energy, and then I got a short memory and just tired all the time." R. 916. According to Williams, her medications helped "sometimes," but they also made her feel groggy, weak, and nauseous. R. 917, 922–23. She reported being more forgetful and walking less because she feared her leg numbness and weakness would cause her to fall. R. 917–18. She also reported staying in the house more than she used to. *Id*. Williams stated that she was having two or three panic attacks each month and that she still had difficulty leaving the house. R. 920–21. She described her mother and daughters as "like a security blanket," something she rarely leaves the house without. R. 920. When asked if her daily activities remained the same, Williams responded, "Yeah," but she explained that her daughters helped with "dishes, mopping, sweeping, cleaning the bathroom, laundry, going to the store." R. 918. Williams indicated that she had about three bad days a week where "I really don't do anything." R. 922. She also still napped two or three times per week for two hours at a time. R. 923.

William Dingess testified at the hearing as a vocational expert. *See* R. 923–29. According to Dingess, a hypothetical person with Williams' age, education, and work experience could work as a cleaner, an assembler, and a hand packager if she could perform work at all exertional levels but had certain mental health limitations. R. 925–26. Dingess indicated that a person restricted to sedentary work with those same mental health limitations could work as an assembler, an inspector, and a hand packager. R. 926–27. In Dingess' view,

5

all competitive work at the unskilled level would be precluded if the person needed two ten-to fifteen-minute unscheduled breaks each workday. R. 927. Dingess testified that employers would tolerate no more than two unscheduled absences per month and about ten such absences a year. R. 928. Tolerance of off-task behavior, according to Dingess, was no more than ten percent of the workday, not including any break periods. *Id.* Finally, Dingess stated that an employee who needed extra supervision "would not be compatible with competitive work." R. 929.

On April 6, 2020, ALJ Bedwell issued a third unfavorable decision to Williams. *See* R. 883–909. The ALJ determined at step one that Williams had not engaged in substantial gainful activity since May 9, 2013, her amended alleged onset date. R. 886. At steps two and three, the ALJ found that Williams' severe impairments—an affective disorder, anxiety, and MS—limited her ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 886–88. With respect to  mental health impairments, the ALJ determined that Williams had a mild limitation understanding, remembering, or applying information; a moderate limitation interacting with others; a moderate limitation concentrating, persisting, or maintaining pace; and a moderate limitation adapting or managing herself. R. 887–88.

The ALJ next assessed Williams' RFC. The ALJ determined that, from May 9, 2013 (the date of the first application), until August 31, 2016, Williams had the RFC to perform work at all exertional levels with the following nonexertional limitations: she could perform jobs that were unskilled and involved simple and routine job tasks and instructions; she could perform jobs having only occasional decision-making and changes in work setting; she could maintain attention and concentration for two-hour segments; and she could have occasional

6

interaction with coworkers and supervisors but no interaction with the public. R. 888. The ALJ determined that Williams' capabilities declined as of September 1, 2016, when she first showed symptoms of MS. *Id.* For that period, the ALJ assessed the same nonexertional limitations listed above. *Id.* However, to account for Williams' MS symptoms, the ALJ further limited her to sedentary work with the ability to change positions between sitting and standing every thirty minutes for a few minutes before returning to sitting or standing; no climbing of ladders, ropes, and scaffolds; and she must avoid exposure to unprotected heights, hazards, and moving machinery. *Id.* In assessing these RFCs, the ALJ did not fully credit Williams' subjective allegations of disabling symptoms. *See* R. 889–91. As for the opinion evidence, the ALJ assigned significant weight to the opinions of several state-agency psychologists; partial weight to the opinions of one state-agency psychologist, the state-agency physicians, a consultative examiner, and a medical expert who testified at the first administrative hearing; limited weight to the opinions of Williams' treating psychiatrists; and little weight to the opinions of Williams' treating therapists. R. 891–97.

At step four, the ALJ determined that Williams had no past relevant work. R. 897. The ALJ determined at step five that, based on her age, education, work experience, and RFC, Williams could have worked as a cleaner, an assembler, and a hand packager from May 9, 2013, until August 31, 2016. R. 897–98. The ALJ further determined that, since September 1, 2016, Williams could work as an assembler, an inspector, and a hand packager. R. 898. Based on those findings, the ALJ determined that Williams has not been disabled since May 9, 2013, the date she filed her first SSI application. R. 898–99.

Williams filed this action on June 8, 2020, seeking judicial review of the ALJ's April 2020 decision. *See* ECF No. 1. The matter was randomly assigned to me, and all parties

7

consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 7. The matter is fully briefed and ready for disposition. *See* ECF Nos. 17, 22, 23.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious

factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Williams contends that the ALJ erred in (1) weighing the opinions of her treating providers; (2) rejecting her claims of disabling symptoms; and (3) failing to account for her certain limitations in the RFC assessment.

## I.     The ALJ's Weighing of the Opinion Evidence

Williams challenges the weight the ALJ assigned to the opinions of her treating psychiatrists, therapists, and neurologist.

## A.    Treating psychiatrists

"For claims filed before March 2017, a treating [source's] opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)); *see also* Social Security Ruling 96-2p, 1996 SSR LEXIS 9, at *1– 4 (July 2, 1996). An opinion that is not entitled to controlling weight need not be rejected. Instead, the opinion is entitled to deference, and the ALJ must weigh it using several factors, including the length, nature, and extent of the claimant's relationship with the treating source; the frequency of examination; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the treating source is a specialist. *See* 20 C.F.R. § 416.927(c); *see also Ramos v. Astrue*, 674 F. Supp. 2d 1076, 1087 (E.D. Wis. 2009). Moreover, the ALJ must always give "good reasons" to support the weight he ultimately assigns to the treating source's opinion. *See* § 416.927(c)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

During the relevant time period, Williams received mental health treatment from two psychiatrists: Dr. Pankhuree Vandana and Dr. Jennifer Bleak. Dr. Vandana began treating Williams in July 2013. *See* R. 807. In November 2013, Dr. Vandana completed a Mental Impairment Medical Source Statement, though she declined to answer many of the questions because at that point she had seen Williams only three times. *See* R. 807–10. Dr. Vandana completed a Mental Impairment Medical Source Statement again in July 2014. *See* R. 803–

06. She opined, among other things, that Williams likely would need to lie down during the workday due to severe fatigue and related symptoms; that Williams would have difficulty working in close proximity to others; that Williams would miss more than four days of work each month for medical treatment or "bad days" with symptoms; that Williams' inability to consistently and independently leave her house would cause her to miss an additional four days or more each month; that Williams would need two or three unscheduled breaks each workday as a result of crying and panic/anxiety; and that Williams' difficulties persisting with tasks and maintaining work pace/efficiency would cause her to be less than fifty percent as efficient as the average worker. R. 803–05. Dr. Vandana further opined that Williams had "marked" limitations in activities of daily living and social functioning. R. 806. Dr. Bleak completed a Mental Impairment Medical Source Statement in February 2015 that largely mirrored Dr. Vandana's July 2014 assessment. *See* R. 811–14.

The ALJ assigned "limited" weight to Dr. Vandana's and Dr. Bleak's opinions. *See* R. 894–95. The ALJ first acknowledged that both psychiatrists were "highly trained mental health provider[s] who personally observed and examined [Williams]." R. 894, 895. Nevertheless, according to the ALJ, their opinions concerning the "degree of severity of [Williams'] symptoms and limitations are not supported by the overall record." *Id.* The ALJ noted that the record demonstrated that Williams "was able to overall tend to her own personal care needs and tend to her activities of daily living, such as attending graduation, shopping, running errands, preparing meals, doing housework, managing her money, watching television, reading, spending time with family, and caring for her daughter." *Id.* (citing B18E [R. 311–20], B38E [R. 1246–55], B37F [R. 815–75], B52F [R. 1608–1723], Hearing record). The ALJ further noted that Williams was "observed on examinations to be

11

pleasant, cooperative, alert and oriented, with appropriate mood, appropriate affect, good eye contact, normal judgment, normal attention, normal concentration, appropriate thought process and adequate memory." R. 894, 995 (citing B30F [R. 705–82], B59F [R. 1859–78], B60F [R. 1879–93], B62F [R. 1901–2002], B63F [R. 2003–45], B64F [R. 2046–51]). In the ALJ's view, these exam observations demonstrated that Williams could "perform basic, unskilled work within the limitations of the assigned residual functional capacity." R. 894, 895.

Williams argues that the ALJ failed to provide good reasons for giving only limited weight to Dr. Vandana's and Dr. Bleak's opinions. *See* ECF No. 17 at 12–17. I agree. In her function reports and hearing testimony, Williams consistently claimed that she had little energy, experienced frequent panic attacks, and had an extreme difficulty leaving the house unless accompanied by a "safe person." *See, e.g.*, R. 39, 41–46, 52–55, 233–38, 240–41, 247, 253, 256–62, 266–67, 269, 314–20, 328–34, 916–18, 920–23, 941–42, 946–47, 950–54. Dr. Vandana and Dr. Bleak addressed these symptoms in their assessments, opining that Williams would need to lie down during the workday due to severe fatigue, would be excessively absent from work, would need multiple unscheduled breaks at work, and would have difficulty persisting with tasks and maintaining work pace. The ALJ concluded that these opinions were not supported by Williams' activities of daily living and mental-status exams, but the examples he provided did not address the main limitations stemming from Williams' impairments.

For one, the ALJ failed to explain *how* Williams' reported activities were inconsistent with the psychiatrists' opined limitations. The activities mentioned by the ALJ—attending to her personal care, preparing simple meals, doing housework, managing money, watching TV,

reading, caring for her daughter—did not require Williams to persist with a task or maintain pace in a manner similar to what would be expected of her in a competitive working environment. Moreover, mentioning that a claimant can perform relatively untaxing and commonplace activities like watching television and reading is merely to say the claimant is not a vegetable, which of course is not the standard for benefits.

> The ALJ cited the fact that she managed her personal care, prepared meals, cared for a toddler, did dishes, handled money, attended church, went fishing a few times a year, and watched television. . . . But these kinds of things are only relevant . . . if the standard for disability is invalidity, that is, if a claimant could only be deemed disabled if she were bedridden and unable to do even the most basic functions. Instead, the standard asks whether someone could work, in a demanding employment setting, for an eight-hour day. Being able to watch television or go fishing a few times a year does not answer that question.

*Reopelle v. Colvin,* No. 14-C-411, 2015 WL 729672, at *5 (E.D. Wis. Feb. 19, 2015).

The ALJ also did not consider that the plaintiff's activities were sometimes quite limited. For example, her function reports indicate that Williams sometimes neglected her personal care—going days without getting dressed or bathing and up to a month without washing her hair—and received significant assistance from her mother and daughters. *See* R. 200, 208, 256, 314, 328, 334. Similarly, while the ALJ noted that Williams attended her daughter's graduation, shopped, and ran errands, he failed to appreciate her difficulties engaging in these activities. The record contains numerous references to Williams experiencing severe anxiety and panic attacks while out in public and even when just thinking about having to leave the house. *See* R. 741–42, 797–98, 801, 847, 852–54, 857, 867, 870, 920–21, 1669, 1675. To mitigate these symptoms, she takes her mother or one of her daughters with her, she goes out at times when not a lot of other people are around, or she simply doesn't go out at all. *See id.* Such "accommodations," however, would not be accepted in a normal working environment.

13

The ALJ also failed to explain how Williams' mental-status exam findings were inconsistent with the psychiatrists' opinions. That Williams was pleasant, cooperative, alert, and oriented with appropriate mood, appropriate affect, good eye contact, and normal judgment says little to nothing about her ability to consistently show up for work and stay on task and maintain pace when she's there. While the ALJ did note that Williams had normal attention, normal concentration, appropriate thought process, and adequate memory, he failed to explain how these exam findings could be extrapolated to a full-time, competitive working environment—that is, the situation the psychiatrists were asked to imagine when giving their opinions. The ALJ also did not consider the many abnormal findings Williams exhibited upon examination. *See* R. 739, 740, 742, 744, 801, 819, 827, 828, 830, 831, 845, 846, 875, 1418–25, 1899–1901.

The Commissioner's arguments in support of the ALJ's weighing of Dr. Vandana's and Dr. Bleak's opinions, *see* ECF No. 22 at 5–12, are unavailing. The Commissioner contends that the ALJ acknowledged Williams' alleged compromised ability to tend to her activities of daily living earlier in his decision. That's true. *See* R. 887, 889. But when weighing the psychiatrists' opinions, the ALJ simply listed Williams' reported activities without explaining how they were inconsistent with specific limitations the psychiatrists imposed. Similarly, the Commissioner contends that the ALJ acknowledged that at times Williams did have remarkable mental-status findings. Acknowledging these findings, however, was not enough. The ALJ failed to reconcile the normal exam findings with the remarkable ones and failed to explain how the normal findings were inconsistent with the psychiatrists' opinions. The Commissioner also makes much of the fact that the psychiatrists' assessments were dated

14

"checkbox" opinions. But the ALJ did not discount the opinions because they were stale and lacked explanation, and I am limited to reviewing the reasons the ALJ did provide.

Accordingly, I conclude the ALJ erred in weighing the opinions of Williams' treating psychiatrists.

### B.  Treating therapists

Williams also received mental health treatment from three psychotherapists: Dawn Pydo, Stacy Trinastic, and Lisa Gibson. Pydo began treating Williams in July 2012 and completed several assessments of Williams' mental functioning in 2013. *See* R. 700–04, 783–85, 786–90. Pydo opined, among other things, that Williams' mental health symptoms would frequently (i.e., 34–66% of an eight-hour workday) interfere with the attention and concentration needed to perform even simple work tasks; that Williams would be absent from work more than three times per month due to her mental health impairments; that Williams would be off task more than thirty percent of the workday; that Williams would be less than fifty percent as efficient as an average worker; and that Williams would require extra supervision several times a day. R. 701–02, 784, 787–88. Pydo further opined that Williams had a "moderate" limitation in activities of daily living, a "marked" limitation in social functioning, and a "marked" limitation in pace, persistence, and concentration. R. 785.

The ALJ assigned "little" weight to Pydo's opinions for three reasons. *See* R. 894. First, the ALJ noted that Pydo was "not an acceptable treating provider under the rules and regulations." *Id.* Second, the ALJ determined that Pydo's opinion concerning absenteeism was "purely speculative and based on [Williams'] subjective reporting." *Id.* Finally, according to the ALJ, evidence in the record post-dating Pydo's assessments "support[ed] a greater

15

degree of mental functioning than Ms. Pydo opined, particularly once [Williams] became more compliant with treatment recommendations." *Id.*

Trinastic began treating Williams in June 2014 and completed mental health reports in June 2015 and November 2016. *See* R. 1825–30, 1830–35. She opined, among other things, that Williams' mental health symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks and that Williams would be absent from work more than three times per month due to her mental health impairments. R. 1826, 1827, 1832, 1833. She further opined that Williams had a "marked" limitation in social functioning. R. 1827, 1833. Trinastic estimated that Williams' mental health symptoms began around 1987. R. 1826, 1832.

The ALJ assigned "little" weight to Trinastic's opinions for three reasons. *See* R. 895–96. First, like Pydo, Trinastic was not considered a treating provider under SSA rules and regulations. R. 896. Second, the ALJ determined that Trinastic's assertion that Williams' symptoms began in 1987 was "based on [Williams'] subjective reporting, as she indicated she had only been treating [Williams] since June 2014." *Id.* Finally, the ALJ concluded that Trinastic's "opined degree of severity of [Williams'] symptoms and limitations . . . are not supported by the overall record," including Williams' presentation upon examination. *Id.*

Gibson began treating Williams in August 2017 and completed mental health assessments in November 2017, January 2018, and June 2018. *See* R. 1455–59, 1790–94, 1797–1801. She opined, among other things, that Williams' mental health symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks and that Williams would be absent from work more than three times per month due to her mental health impairments. R. 1791–92, 1798–99. Gibson further opined that Williams

16

would need to lie down for three or more hours during the workday due to fatigue or related symptoms; that Williams would have difficulty working in close proximity to others; that Williams would miss more than four days of work each month for medical treatment or "bad days" with symptoms; that Williams' panic attacks would cause her to miss an additional four days or more each month; that Williams would need four or five unscheduled breaks each workday; that Williams' limitations with attention and concentration would cause her to be off task twenty-five percent of the workday; and that Williams would be fifty percent as efficient as the average worker. R. 1455–57. According to Gibson, Williams had at least a "marked" limitation in her ability to understand, remember, and apply information; at least a "marked" limitation in her ability to interact with others further; at least a "marked" limitation in concentrating, persisting, or maintaining pace; and a "marked" limitation in adapting and managing herself. R. 1458–59. Gibson estimated that Williams' mental health symptoms began around 2004. R. 1791, 1798. Gibson also wrote a letter in October 2018 in which she indicated that Williams' ongoing struggle with anxiety "creates a challenge in her daily living and functioning." R. 1845.

The ALJ assigned "little" weight to Gibson's opinions for three reasons. *See* R. 895. First, Gibson was not an acceptable treating provider. *Id.* Second, in the ALJ's view, Gibson's October 2018 letter "provide[d] little insight into [Williams'] work-related functional abilities," as it was "vague and did not include a function-by-function analysis of [Williams'] functioning." *Id.* Finally, the ALJ determined that "Gibson's overall opined degree of severity of [Williams'] symptoms and limitations are not supported by the overall record," which showed that Williams generally was able to "tend to her own personal care needs and tend to

17

her activities of daily living." *Id.* The ALJ further noted that Williams generally presented with normal functioning upon examination. *Id.*

Williams argues that the ALJ failed to provide good reasons for assigning little weight to the opinions of her therapists. *See* ECF No. 17 at 11–17. Again, I agree. As with Williams' psychiatrists, the ALJ failed to explain *how* the opinions of Williams' therapists were inconsistent with her activities of daily living and mental-status exams. The ALJ provided other reasons for rejecting the therapists' opinions, but none of these additional reasons withstand scrutiny.

The ALJ correctly noted that, at the time of Williams' application, therapists—unlike licensed psychologists—were not considered "acceptable medical sources" under SSA's rules and regulations, meaning their opinions could never be afforded controlling weight no matter how persuasive they are. *See* 20 C.F.R. §§ 416.902, 416.913; SSR 06-03p, 2006 SSR LEXIS 5 (Aug. 9, 2006) (rescinded as of Mar. 27, 2017). However, opinions from therapists were still "important and should be evaluated on key issues such as impairment severity and functional effects." SSR No. 06-3p, 2006 SSR LEXIS 5, at *8. In evaluating the opinion evidence from Williams' therapists, the ALJ could apply the same factors used to evaluate opinions from an acceptable medical source. *Id.* at *10–11 (citing § 416.927(d)). The ALJ here, however, failed to consider that the therapists' opinions were consistent with the opinions of Williams' treating psychiatrists concerning lying down during the workday, excessive absences, unscheduled breaks, and persisting with tasks and maintaining work pace. Consequently, the fact that the opinions came from "nonmedical sources" was not a solid reason for rejecting them.

18

None of the individualized reasons for rejecting each therapists' assessment fares any better. Each treating provider was asked to estimate, on average, how often Williams would be absent from work due to medical treatment and bad days with symptoms. They all had the same answer: at least three days each month. For reasons that remain unclear, the ALJ held this estimate against Pydo only, finding her opinion about absenteeism too speculative and too heavily influenced by Williams' subjective reports. But Williams was not working at the time of Pydo's (or the other providers') assessments, so of course she didn't have objective data to support that estimate. This deficiency, however, was not a good reason for rejecting it, as Pydo's estimate necessarily was informed by her treatment relationship with Williams and her knowledge of Williams' impairments and their resulting limitations. The ALJ also rejected Pydo's opinions because they were inconsistent with more recent evidence; however, the ALJ never cited to any specific evidence in the record. *See* R. 894. Turning to Trinastic, it's unclear why the ALJ placed any significance on her estimate of when Williams' symptoms began. Trinastic thought they began around 1987, and there is evidence in the record reflecting that Williams, who was born in 1977, first developed anxiety in middle school. Finally, Gibson's October 2018 letter vaguely referencing Williams' limitations in daily living and functioning is simply irrelevant to her earlier, more specific assessments.

Accordingly, the ALJ erred in weighing the opinions of Williams' treating therapists.

## C.     Treating neurologist

Dr. Michael Connor began treating Williams' MS symptoms in October 2016. R. 1557. In January 2017 and October 2017, Dr. Connor completed Medical Examination and Capacity forms concerning Williams' impairments and limitations. *See* R. 1803–07, 1839–43. On the forms, Dr. Connor described Williams' symptoms and treatment and indicated that

19

Williams' symptoms would frequently interfere with performance of simple work tasks. R. 1804–05, 1840–41. However, he declined to express an opinion about Williams' physical capacities, noting that his office does not perform functional capacity exams. *See id.*

Nevertheless, in March 2018, Dr. Connor filled out a Multiple Sclerosis Medical Assessment form in which he opined, among other things, that Williams' limitations with attention and concentration would cause her to be off task thirty percent of the workday; that Williams would be fifty percent as efficient as an average worker; that Williams would need six unscheduled breaks each workday; and that Williams would miss more than four days of work each month due to medical treatment or bad days with symptoms. *See* R. 1557–60. Dr. Connor further opined that Williams could sit for more than two hours at a time and about four hours in an eight-hour workday; stand for thirty minutes at a time and less than two hours in a workday; occasionally lift less than ten pounds but never more than that weight; occasionally twist; and rarely stoop. R. 1559–60. According to Dr. Connor, Williams also had limitations handling, fingering, and reaching, such that she could only occasionally handle objects and reach with her right upper extremity. R. 1560.

The ALJ assigned "limited" weight to Dr. Connor's opinions. *See* R. 896. The ALJ acknowledged that Dr. Connor "is a highly trained neurologist who personally observed and examined [Williams]." *Id.* He also acknowledged that Dr. Connor treated Williams' MS symptoms for over two years from the time they began in 2016. *Id.* Nevertheless, the ALJ determined that Dr. Connor's opinions were "internally contradictory" insofar as he claimed to not perform functional capacity exams on the 2017 forms but yet the 2018 form contained specific functional capacity limitations. *Id.* The ALJ further determined that Dr. Connor's opinions were "contradicted by his own examination notes showing normal strength, range

20

of motion, sensation, reflexes, and gait despite her MS." *Id.* (citing B40F [R. 1318–50], B47F [R. 1461–93], B48F [R. 1494–1520], B51F [R. 1561–1607], B62F [R. 1902–2002], B65F [R. 2053–50]).

Williams argues that the ALJ erred in weighing Dr. Connor's opinions. She first contends that the ALJ committed reversible legal error by focusing exclusively on Williams' exertional limitations and not articulating any reason for rejecting Dr. Connor's opinions regarding time off task, slow work pace, and absenteeism. *See* ECF No. 17 at 18. But the ALJ did provide a reason for rejecting Dr. Connor's opinion concerning limitations in concentration, persistence, and pace: they contradicted Dr. Connor's statement in each of his three assessments that he does not perform functional capacity evaluations. *See* R. 1558–60, 1804–05, 1840–41. That caveat was not limited to Dr. Connor's opined exertional limitations; it explicitly applied to his opinion that Williams would be off task thirty percent of the workday and would be fifty percent as efficient as an average worker. *See* R. 1558.

Williams also takes issue with the reasons the ALJ did provide for rejecting Dr. Connor's opinions. *See* ECF No. 17 at 18–19. According to Williams, Dr. Connor's caveat about not performing functional capacity evaluations does not make his opinions internally contradictory. I disagree. Dr. Connor did not explain his sudden about-face or how, without such an evaluation, he arrived at his specific functional limitations. The ALJ reasonably relied on this inconsistency and the lack of support for Dr. Connor's opinions. *See* 20 C.F.R. 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). As for the ALJ's other reason, inconsistency with his own examination notes, Williams contends that Dr. Connor's opined limitations were based on symptoms that

21

would not necessarily be demonstrated during a physical exam, including chronic fatigue, bladder control problems, impaired memory/concentration, chronic pain/paresthesia, associated psychological problems, and sensitivity to heat. *See* ECF No. 17 at 19 (citing R. 1557). This argument, however, is inconsistent with Dr. Connor's explicit qualification that a functional capacity evaluation was needed to assess Williams' exertional abilities and limitations. The ALJ reasonably found that those opined limitations were inconsistent with the unremarkable physical exam findings. *See* 20 C.F.R. 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Accordingly, the ALJ did not error in weighing Dr. Connor's opinions.

## II. The ALJ's Evaluation of Williams' Alleged Symptoms

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

22

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record.'" *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

After summarizing Williams' allegations, the ALJ here determined "that [Williams'] medically determinable impairments could reasonably be expected to produce some of the symptoms of the types alleged," but found that Williams' "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." R. 889–91. The ALJ found that the record did not fully substantiate Williams' allegations of disabling mental health symptoms, as she "retained relatively good mental functioning despite these conditions"; notwithstanding some remarkable mental-status findings, she was observed to be "appropriately groomed, pleasant, cooperative, calm, alert and oriented, with good eye contact, goal-directed thought process, relevant thought content, and intact perceptions"; she was described "as having a good sense of humor[] and to laugh and smile through examinations"; a depression screening revealed only mild depression at times; and her symptoms improved with treatment. R. 891.

As for Williams' MS symptoms, the ALJ concluded that Williams "retained relatively good physical functioning despite this condition." *Id.* Specifically, Williams reported in November 2016 that she had not experienced many symptoms from her MS; despite abnormal findings in 2016, diagnostic imaging of her brain and spine the following year were "stable"; during physical examination Williams had "normal gait," "normal sensation, normal strength, symmetrical reflexes, normal motor findings, and normal range of motion"; and Williams' symptoms improved with treatment. *Id.* The ALJ also noted that Williams was "able to overall tend to her own personal care needs and tend to her activities of daily living." *Id.*

Williams argues that the ALJ committed a series of errors when evaluating her subjective symptoms. She first repeats her arguments concerning the ALJ's reliance on her mental-status exams and activities of daily living. *See* ECF No. 17 at 21. As more fully explained when addressing the weight assigned to Williams' treating providers, I agree that the ALJ failed to explain how the exam findings and reported activities he mentioned were inconsistent with Williams' main mental health symptoms: fatigue, persisting and staying on task, and anxiety when leaving her home.

Williams next contends that the ALJ cherry-picked one depression screening in an attempt to show that her symptoms were not severe as alleged. *See id.* Again, I agree. While the depression screening cited by the ALJ did reveal only mild depression, R. 2058, treating providers frequently noted more severe symptoms, *see, e.g.*, 739, 850, 858, 871, 1387, 1418–25, 1556, 1671, 1674, 1855–57, 1900–01.

As for her alleged improvement with medication and counseling, Williams maintains that her symptoms varied and that, even during times of improvement, her symptoms didn't

24

improve enough to meet the demands of full-time competitive work. *See* ECF No. 17 at 21–22. The ALJ, however, did not equate Williams' improvement with an ability to work. Rather, the ALJ reasonably relied on Williams' own statements of improvement to conclude that her mental health symptoms were not as severe as alleged. And the ALJ still limited Williams to very undemanding mental work.

Finally, Williams takes issue with the ALJ's reliance on diagnostic imaging in relation to her physical symptoms. *See id.* at 22. An MRI of Williams' brain in 2016 revealed "subtle white matter lesions of unclear etiology." R. 2054–55. These lesions remained "unchanged" on a follow-up MRI in April 2017. *See* R. 1357. The ALJ pointed to this stability as a reason for discrediting Williams' statements concerning her physical symptoms. However, stability does not mean improvement or lack of abnormal findings. Moreover, in September 2018, Dr. Connor noted that "[r]ecent repeat MRI brain reveals two new lesions suggestive of advancing disease." R. 2055. Nevertheless, Williams does not challenge any of the other reasons the ALJ provided for not fully crediting her alleged MS symptoms, and those reasons are supported by substantial evidence.

Accordingly, the ALJ committed several errors when evaluating Williams' statements of disabling mental health symptoms.

## III.    The ALJ's Assessment of Williams' RFC

Williams' last argument is that the ALJ's RFC assessment failed to account for the variable nature of her mental health symptoms and her inability to consistently leave her home. *See* ECF No. 23–28. Williams testified that she was unable to work due to agoraphobia, good and bad days, and low energy. R. 39, 941. She admitted to shopping and going out in public at times but claimed that she almost always had someone with her when she did. R.

41, 43–46, 53–54, 941–42, 946–47, 950–51. She also claimed that she sometimes missed or rescheduled appointments because she was too anxious about leaving the house. R. 54. Williams stated that she had about three or four bad days each week where she spent all day in bed. R. 54–55, 952–53. Moreover, the record contains numerous references to Williams' variable symptoms and anxiety about leaving her house. And all of Williams' treating mental health providers opined that she would miss at least three days of work each month due to treatment or bad days with symptoms, and some thought she would miss even more days on account of her difficulties consistently and independently leaving her house.

Notwithstanding this evidence, the ALJ's RFC assessment did not include any limitations to account for Williams' alleged inability to consistently show up for work. At step three, the ALJ did conclude that Williams was able to engage in activities, like shopping, that required her to go out in public. *See* R. 887. However, the ALJ never addressed Williams' allegation that she rarely did so without her mother or one of her daughters and that she often cancelled appointments if she had to go alone. Nor did the ALJ address how these limitations could be accommodated in the workplace. Accordingly, the issues identified above concerning the ALJ's weighing of the opinion evidence and evaluating Williams' alleged symptoms also impacted the ALJ's RFC assessment.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ committed reversible error in weighing the opinions of Williams' mental health providers and evaluating Williams' subjective allegations of disabling mental health symptoms. Williams argues that she should be awarded benefits given that her treating psychiatrists' work-preclusive opinions are well-supported by and not inconsistent with the evidence in the record and given the

26

unconscionable delay in repeated remands. *See* ECF No. 17 at 28–30. The Commissioner did not respond to this argument. *See generally* ECF No. 22. Even so, although the delay caused by repeated remands is unfortunate, courts do not have the authority to grant benefit awards unless it is clear that the claimant is disabled. *Briscoe ex rel. Taylor v. Barnhart,* 425 F.3d 345 (7th Cir. 2005) ("[o]bduracy is not a ground on which to award benefits; the evidence properly in the record must demonstrate disability.")

Accordingly, the Commissioner's decision is **REVERSED**, and this action is **REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g). The clerk of court shall enter judgment accordingly.

SO ORDERED this 19th day of March, 2021.

STEPHEN C. DRIES
United States Magistrate Judge

27